LOTTINGER, Judge.
This is a suit filed by Clarence M. Lem-mon and his wife for damages resulting to their son, Dennis Ray Lemmon, who was killed as a result of an automobile accident. The named defendants are Loiston B. Babb, the driver of a petroleum tank and trailer truck, his employer, Wanda Petroleum Company, its insurer, Pan American Fire & Casualty Company, and Hanover Insurance Company, the liability insurer of the 1964 Chevrolet automobile in which young Lemmon was riding as a guest passenger. The Lower Court rendered judgment in favor of defendants and dismissed petitioners’ suit. Petitioners have filed this appeal.
On the night of November 23, 1965, Dennis Ray Lemmon was a member of a band which played for a fraternity dance which was being held in Labadieville, Louisiana. At the dance were numerous students from Nicholls State College, including, among others, Paul M. Huddle-ston, Charles Bonvillain and Frank Pasqua. The dance started some time around 8:00 o’clock in the evening and was scheduled to last until midnight. According to the witnesses, most of the young people brought their own bottles of liquor to the dance and the fraternity also furnished several bottles, estimated from four to eight, for the band and the officers. At midnight the dance was progressing so well that the party goers took up a collection to keep it going.
The record reflects that after the dance, at approximately 3 :00 o’clock on the morning of November 24, Dennis Ray Lemmon, Charles Bonvillain, Frank Pasqua and Paul M. Huddleston met at the Cozy Lounge, a night club located on the outskirts of Thi-bodaux, and they decided to take a ride toward Houma. There was some discussion among the boys as to which automobile they would ride in but they decided to ride in the car operated by Huddleston.
Shortly after entering the Huddleston automobile, Dennis Lemmon, who was a guest passenger, went to sleep and apparently remained asleep until the time of the accident. The accident occurred at approximately 4:40 o’clock a. m. on U.S. Highway 90 at about two miles east of the City of Houma, Louisiana, when the Hud-dleston vehicle failed to negotiate a curve to its right and crossed over the center line and ran into the truck and trailer belonging to Wanda Petroleum Company which, *274 at the time of impact, was completely on its side of the highway with its right wheels on the shoulder. As a result of the accident, Paul Huddleston, the driver, and Dennis Lemmon, were killed. The other two guest passengers in the car, Charles Bonvillain and Frank Pasqua, were injured.
After trial on the merits, the Lower Court dismissed plaintiff’s suit as against all defendants, and from this judgment the plaintiffs have appealed only insofar as the judgment dismissing their suit as against Hanover Insurance Company, the insurer of the Huddleston autopiobile. It was obvious from the record that there was no evidence presented to show any negligence on the part of Wanda Petroleum Company or its driver, Loiston B. Babb, and accordingly, no appeal was taken from the judgment dismissing the suit as to those defendants and their liability insurer, Pan American Fire & Casualty Company.
The findings of facts, as related by the Lower Court, are as follows:
“The issues presented by the pleadings make it necessary for us to determine factually whether Huddleston’s negligence resulted from an impairment of his ability to drive due to his concumption of alcohol; and whether that condition, if it existed, was known to or should have been known to Dennis Ray Lemmon and Frank Pasqua.
“We think that both questions must be answered in the affirmative.
“Pasqua himself also testified that upon was not under the influence of alcohol. That may well be Pasqua’s honest evaluation of Huddleston’s condition; but other testimony, equally as honest, raises considerable doubt as to the validity of that evaluation. We are unable to determine with exactitude the number of drinks or the quantity of alcohol consumed by Huddleston or the other occupants of Huddleston’s car, but the Court has no doubt that the effects of such drinking were noticeable. “Pasqua himself also testified that upon leaving the Cozy Lounge, Huddleston was cautioned by Bonvillain to drive more slowly. This was about a minute after they had left the Cozy Lounge and Huddleston was driving at a speed of sixty or seventy miles per hour. It is noted also that Pasqua stated he had had only two drinks before coming to the Cozy Lounge and that during the two hours he was waiting there for the others he ordered one beer, but didn’t drink it. It is of interest, in connection with the evaluation of the testimony that Pas-qua stated it would take six or seven drinks to affect his own driving ability.
“Although Pasqua testified that he had not paid any particular attention to Lem-mon’s condition, since he had just met him, it was brought out on cross-examination that he had signed a statement wherein he said that Lemmon appeared to have been drinking. Bonvillain testified that all four ordered drinks at the Cozy Lounge.
“Miss Sandra Ann Alexander, Lemmon’s date for the evening, testified that one drink had been passed around on the way to the dance and that Lemmon took more than one drink during the evening, and that he had ‘had too much to drink’; that Lemmon’s brother wanted to take Miss Alexander to her home, but Lem-mon insisted on taking his own date home. She stated also it was her opinion that both Lemmon and Bonvillain were under the influence of intoxicating liquor, when they left her at her home at between 2:00 and 2:30 a. m.
“We think it also of considerable significance that Larry Lemmon, brother of Dennis Ray Lemmon, asked Dennis at the Cozy Lounge not to go with the other young men.
“With regard to the condition of Hud-dleston, we note the testimony of Paul J. Carmouche, his cousin, also at the dance. Carmouche saw him twice and described his condition as ‘high’. That adjective *275 he defined to mean between sober and drunk and reached that conclusion because Huddleston was sluggish, not speaking too clearly and was ‘weaving slightly’. He last saw Huddleston in the dressing room at about 12:30 a. m.
“Thomas Tinsley who also saw Huddle-ston at about 12:30 a. m., said the latter had been drinking all evening, and was stumbling on the way to his car. Tins-ley felt Huddleston was unable to drive and asked the latter to let him drive. Tinsley stated that he himself had ‘at most three drinks’ since his date disapproved of drinking.
“Pasqua testified that after leaving the Cozy Lounge, they stopped at the Waterfall, another bar, leaving Lemmon in the car. Pasqua said that they bought drinks for three, but left them there. Bonvillain knew that they made two stops after leaving the Cozy Lounge, that one was at the Miniature House and the other may have been the Waterfall. Under cross-examination, he stated that both Huddleston and Lemmon were ‘possibly tipsy.’
“At the Miniature House, both Bonvil-lain and Pasqua agree, all three ordered drinks, but Bonvillain said he didn’t even finish his. Lemmon never got out of the car.
“The Miniature House was apparently their last stop before the accident; and the testimony of Mrs. Bobby Jones, wife of the proprietor of the Miniature House, and of Mr. Druby LeBoeuf is significant.
“Mr. LeBoeuf testified he was in the Miniature House when the three young men came in. He was there apparently to visit the Joneses and was not drinking. He said the young men were pretty loud and ordered drinks but did not remember how many. He stated also he assumed someone was asleep in the car because he heard one of the three say ‘get up’. In describing their departure, LeBoeuf said ‘it was fast’, and he remarked to Mrs. Jones that he didn’t think they’d make it at that rate of speed.
“LeBoeuf identified Pasqua as one of the three who had come into the Miniature House and further testified that he, LeBoeuf, was there when Trooper Thi-bodaux (who investigated the accident) came in and discussed the accident.
“Mrs. Jones stated that the three boys came in the Miniature House and were ‘loud and boisterous’. She said each had a drink and she served an additional drink and ‘one to go.’ She confirmed, in essence, that LeBoeuf had remarked about the speed at which the boys ‘took off’. She also stated that LeBoeuf doesn’t drink because he has diabetes. In her opinion, and she stated she had worked in bars for 18 years, the three boys were intoxicated.
“State Trooper, Roland J. Thibodaux, investigated the accident and testified that he found a can of beer half full on the right front floor board of the Huddle-ston car, and a broken bottle. He testified further that a broken pint or half-pint bottle was found in Huddleston’s coat when the body was undressed at the funeral home.
“Thibodaux’s testimony reflected that he had talked to Pasqua at the hospital and identified the place where they had last stopped. Apparently, though not knowing its name, Pasqua remembered that a white Thunderbird had been parked there. It turned out to be the Miniature House, where Thibodaux also stated that at about 7:00 a. m. at the Terrebonne General Hospital Pasqua told him they ‘had been drinking all night.’
“From all of the testimony, the absence of any indication whatever of any negligence on the part of Babb, the absence of any evidence showing any other cause of the accident, or that any extraordinary traffic situation, or emergency *276 arose to cause the accident, we have concluded that Huddleston’s intoxication was the sole and proximate cause of the accident.
“Plaintiff’s respective positions may be summarized briefly as the contention that the accident was caused by Huddle-ston’s negligence, but that such negligence was not the result of intoxication; that neither Lemmon nor Pasqua had any indication that Huddleston was intoxicated, and therefore are not vulnerable to the defense of assumption of the risk raised by defendants.
“The photographs of the Huddleston car after the accident, filed in evidence as exhibit ‘Hanover 4’ leave no doubt as to the force of the impact and indicate that the Huddleston car was travelling at a high rate of speed. It is' also noted that Trooper Thibodaux testified (and it can be seen on photograph no. 6 of ‘Hanover 4’) that the speedometer of the Huddle-ston car was ‘stuck’ on 80 miles per hour. Since there is no proof that such circumstance indicates conclusively (as it might in the case of a stopped watch) the speed at the time of impact, the Court arrives at its conclusion of speed only from the testimony and said photographs. But the court finds no reason to divorce the speed of the Huddleston car from the impairment of its driver’s mental and physical faculties due to the effects of alcohol. We believe that defendants have born the burden of proving by a preponderance of the evidence that the mental and physical faculties of Huddleston were materially impaired.”
In applying the doctrine of assumption of risk, the Lower Court cited Jones v. Continental Casualty Company, 246 La. 921, 169 So.2d 50; and Barnebuy v. Northwestern Mutual Insurance Company, La.App., 186 So.2d 658.
The only material argument of petitioners on this appeal is their allegation that the Lower Court erred in applying this doctrine because from approximately 3:00 a. m. when the boys left the Cozy Lounge, until the time of the accident, young Lem-mon was a sleeping guest passenger and was not aware of Huddleston’s impairment from the consumption of alcohol. It is contended by petitioners that at the time they left the Cozy Lounge, young Huddleston was not noticeably intoxicated so as to put young Lemmon on guard.
We do not believe such to be the case. Tracing the action of Huddleston during the evening of this dance, Paul Carmouche, a first cousin to Huddleston, testified that shortly before the dance broke up he observed him in the dressing room and said that he was “rather sluggish and wasn’t speaking too clearly.” He was speaking “rather slowly and incoherently,” and was “weaving just slightly”. He was “high”.
Thomas Tinsley testified that as he and his date were leaving the dance, Huddle-ston was directly in front of him and he was “stumbling and mumbling”, and Tins-ley asked if he would let him drive him home because he felt that he wasn’t capable of driving. This was some time around 12:30 or 1:00 o’clock in the morning.
After the dance, Huddleston apparently drove his date to Donaldsonville and then back to the Cozy Lounge in Thibodaux, a distance of some sixty miles. When Charles Bonvillain arrived at the Cozy Lounge some time before 3 :00 a. m., Hud-dleston and young Lemmon were sitting at the bar together and had apparently been drinking, otherwise he knew no reason why they would have been sitting at the bar. They ordered a round of drinks, and left the lounge at 3 :00 as it was closing up for the night.
As they walked out of the Cozy Lounge, a discussion was held and apparently all occupants of the car wanted to keep on going to other places. They decided to go to Houma in Huddleston’s car.
They first stopped at the Waterfall, a bar situated near Houma, and ordered a *277 round of drinks. The two survivors testified that they didn’t consume the drinks as there was no one else in the bar and so they left to go to the Miniature House, another barroom situated closer to Houma.
Mrs. Artie Mae Jones, co-proprietress of the Miniature House with her husband, testified that the boys were in her establishment some time between 3:00 and 4:00 o’clock in the morning. They were “loud and boisterous”. She stated that they consumed two drinks on the premises and took one to go. It was her opinion that “they were intoxicated”. This testimony was corroborated by that of Druby J. LeBoeuf, a friend of the Joneses, who was visiting in the bar, and who had not been drinking because of a diabetic condition.
The record also reflects that young Lem-mon was “high or intoxicated” at the. end of the dance at 1:00 a. m. This was established by the testimony of Rudolph Stahl, who testified that he saw Lemmon drinking during the dance, and that he was “mumbling and incoherent” near the end of the dance.
If Lemmon was still high at 3:00 a. m. when he entered the Huddleston car, the doctrine of assumption of risk would still be applicable to him. In McAllister v. Travelers Ins. Co., La.App., 121 So.2d 283, the Court said:
“Learned counsel for plaintiff has cited no authority in our jurisprudence in support of his contention that voluntary intoxication of a guest passenger may be urged in bar of the defense of contributory negligence or assumption of risk tendered by an intoxicated host driver in opposition to his guest’s claim for personal injuries on the theory that voluntary intoxication of the guest passenger deprives him of the mental capacity to appreciate the danger thus involved and the will to elect to expose himself thereto.
“So far as we have been able to determine, the issue appears to be res novas in this state. To adopt the rule advocated by counsel for plaintiff would, in the opinion of this court be contrary to public policy and good morals inasmuch as the principal thereby established would be tantamount to placing a premium on moral turpitude. Additionally, jurisprudence of this nature would open the door to fraud and encourage fabrication of evidence in accident cases involving injury of guest passengers by drunken host drivers. Such a rule would facilitate imposition of liability upon intoxicated host drivers for injuries to guest passengers by the simple expedient of the guest declaring and acknowledging his insensibility to danger induced by voluntary drunkenness. For the reasons stated, this court is not prepared to establish such jurisprudence and, therefore, holds there is no merit to this contention.”
' On the other hand, if young Lemmon was' not “high” when they left the Cozy Lounge, .he should have been aware of Huddleston’s impairment, and the doctrine of assumption- of risk would still apply. In Daigle v. United States Fidelity & Guaranty Company, La.App., 187 So.2d 214, the Court of Appeal denied recovery to a guest passenger who went to sleep after having had several drinks with the driver at a lounge and then at a party. In that case, the Court said:
“Even plaintiff’s own witnesses said Carroll appeared to have had a few drinks; that he was not sober and he was not drunk. This must be interpreted to mean that he did not have normal control of his mental and physical faculties.”
In Roller v. Cormier, La.App., 192 So.2d 568, the Court citing Viator v. Grain Dealers Mutual Insurance Company, La.App., 182 So.2d 165, the Court said:
“When an accident occurs involving a driver whose mental or physical faculties have been materially impaired due to the influence of intoxicants, a guest passenger who knows or should know of the *278 driver’s condition and nevertheless voluntarily rides with him cannot recover for injuries received in an accident caused in whole or in part by the driver’s negligence if the alcohol-induced impairment of the driver’s ability is a substantial contributory cause of the driver’s negligence. Under such circumstances, the passenger’s recovery is barred not only against his host driver but also against third persons whose negligence contributed to the accident, provided that the host driver’s intoxicant-caused negligence contributed to the accident.”
In the Roller case the Court further said:
“It is [Hjornbook [Ljaw that a guest passenger who voluntarily accompanies an intoxicated driver cannot recover for injuries received in an accident, the cause of which may be attributed to the driver’s consumption of intoxicants.”
In Jones v. Continental Casualty Company, 246 La. 921, 169 So.2d 50, the Supreme Court of this State said:
“The courts have repeatedly recognized that in order to prove that one is incapable of operating a motor vehicle, it need not be shown that he was drunk, but only that he had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired; and that whenever a guest companion who knew or should have known that the driver was under the influence of drink, voluntarily rode with him in such condition, the right of the guest to claim damages is barred.” (cases cited)
We believe that the record clearly reflects that at 3:00 o’clock a. m. on the morning of the fatal accident when young Lemmon entered the Huddleston vehicle to continue partying, he knew or should have known the condition of young Huddleston. These boys had been drinking some time after the dance started at 8:00 o’clock p. m. until this time. Young Lemmon’s brother testified that he was at the Cozy Lounge and attempted to persuade Lem-mon not to accompany Huddleston and the others to Houma. Notwithstanding the pleas of his brother, young Lemmon continued with his young friends.
Considering the jurisprudence which we have quoted above, we feel that the doctrine of contributory negligence, or assumption of risk, applies to the present case. We agree with the findings of fact of the Lower Court before whom the witnesses were present and testified, and whose findings are entitled to great weight.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by petitioners.
Judgment affirmed.